# No. 27758

## The People of the State of Colorado v. Charles E. Blair
(579 P.2d 1133)

Decided June 5, 1978. Rehearing denied June 26, 1978.

J. D. MacFarlane, Attorney General, David W. Robbins, Deputy, Edward G. Donovan, Solicitor General, Sharon S. Metcalf, Assistant, David K. Rees, Assistant, for plaintiff-appellee.

Clarence A. Decker, David A. Sorenson, for defendant-appellant.

*En Banc.*

MR. JUSTICE GROVES delivered the opinion of the Court.

This is an appeal of defendant's convictions of 17 counts of securities fraud. Sixteen of the counts were for violation of subsection (b) of section 11-51-123, C.R.S. 1973, while one count was for violation of subsection (c). Section 11-51-123 provides:

"Fraudulent and other prohibited practices. (1) It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly:

"(a) To employ any device, scheme, or artifice to defraud;

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

The defendant was president and chairman of the board of the three nonprofit Colorado corporations: Calvary Temple, Life Center, Inc. and The Charles E. Blair Foundation. Calvary Temple is a church; Life Center, Inc., owned and operated nursing homes, including one named Life Center; and The Charles E. Blair Foundation made television films designed to raise money for Life Center. All three corporations sold securities through a single "Department of Development." The "Department of Development" was managed by Wendell Nance and had a staff of approximately ten salesmen.

The 16 counts of violation of subsection (b) in the indictment were based on misrepresentations and omissions made from March 1, 1972 through January 1974 in connection with the sale of investments to twelve different investors. The violation of subsection (c) is alleged to have occurred on a continuing basis from December 7, 1971 to March 13, 1974.

Life Center and The Charles E. Blair Foundation were individually insolvent continuously from 1971. On a combined basis the three corporations had a continuous fund deficit after September 30, 1971. By August 31, 1973, the net worth deficit of the three corporations had reached seven million dollars; they also had annual projected losses of 2.6 million dollars; and their cash flow projections indicated a serious likelihood that current obligations could not be paid. As of September 30, 1973, on a consolidated basis the three corporations had over $14,000,000 in unsecured debt and almost $9,000,000 in secured debt. Since they did not have enough income to meet their interest obligations, interest was being paid out of the principal of current investments. Also as of September 30, 1973, Calvary Temple and Life Center began to have delinquencies as to some interest payments to investors. During late 1973 and early 1974, the financial

condition of the corporations continued to worsen and all interest payments to investors stopped in March 1974. On June 7, 1974, the corporations filed petitions for reorganization proceedings in bankruptcy court.

Disclosure was never made to potential investors that the corporations were either insolvent or in serious financial trouble. In addition, no disclosure was made that the investors' investment in principal would be used to pay interest on prior investments. The defendant also made various affirmative misrepresentations, including a statement to his securities salesmen in April 1973 that the liquidation value of the assets of the three corporations exceeded their liabilities by three million dollars. In fact, the reverse was true. In the case of a liquidation, liabilities would have probably exceeded the amount realized from assets by at least six million dollars. Throughout it all, the sales representatives and the brochures issued by the "Department of Development" assured investors that their investments were safe and secure.

A jury found the defendant guilty. Following the jury's verdict of guilt as to the 17 counts, the judge suspended the defendant's sentence and placed him on probation for five years. As a condition of probation, the defendant was ordered to pay a fine of $12,750.00 ($750.00 per count). *See* section 11-51-124(1), C.R.S. 1973; Crim. P. 32(d)(2)(D).

## I.

In our view, the primary question before us is whether the jury was correctly instructed as to the mental state necessary to constitute a criminal violation of 11-51-123. The criminal provisions as to section 11-51-123 are provided by section 11-51-124(1):

"Criminal penalties. (1) Any person who *willfully* violates any provisions of this article . . . is guilty of a felony and, upon conviction thereof, shall be punished by a fine of not more than five thousand dollars, or by imprisonment in the state penitentiary for not less than one year nor more than three years, or by both such fine and imprisonment." (emphasis added)

The jury instructions given in this case provided in part:

"To constitute a crime there must be the joint operation of an act forbidden by law or an omission to perform an act required by law and a culpable mental state of the Defendant. A culpable mental state means intentionally or knowingly, as those terms are explained in this instruction."

* * * *

"A person acts 'knowingly' with respect to conduct or to a circumstance described by a statute defining an offense when he is aware, or reasonably should be aware, that his conduct is of that nature or that the circumstance exists."

* * * *

"With respect to the crime of Fraudulent and Other Prohibited Practices in the Sale of Securities, as charged in Count One of the Indictment, a person commits that crime if:

"In connection with the offer, sale, or purchase of any security, he knowingly engages in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

"The elements of that crime are therefore:

"(1) In connection with the offer, sale, or purchase of any security.

"(2) Knowingly,

"(3) Engages in any act, practice or course of business,

"(4) Which operates or would operate as a fraud or deceit,

"(5) Upon any person."

* * * *

"With respect to the crimes of Fraudulent and Other Prohibited Practices in the Sale of Securities, as charged in Counts Two through Seventeen, inclusive, of the Indictment, a person commits those crimes if:

"In connection with the offer, sale, or purchase of any security by or to any other person, directly or indirectly, he knowingly makes any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

"The elements of those crimes are therefore:

"(1) In connection with the offer, sale, or purchase of any security.

"(2) By or to any other person,

"(3) Directly or indirectly,

"(4) Knowingly,

"(5) (a) Makes any untrue statement of a material fact, or

"(b) Omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading."

The question is whether, when taken as a whole, these instructions adequately set forth the offenses of which the defendant was charged.

The defendant contends that "willfully" as used in the statute (1) does not mean "knowingly" and (2) does not include "reasonably should be aware."

While the instructions are not models, they are adequate to support the conviction.

■ Our inquiry must begin with the definition of the word "willfully" as used in the context of this statute. The effect of the word "willfully" as used in this statute is "knowingly."

A little background is in order. Section 11-51-123 and 124, C.R.S. 1973 came from the Uniform Securities Act, sections 101 and 409. *See* 7 U.L.A. 695, 768. Section 101 of the Uniform Securities Act is substantially the same as the well-known Rule 10b-5 of the Securities and Exchange Commission. 17 C.F.R. §240.10b-5. Rule 10b-5 was adopted pursuant to the authority granted to the S.E.C. under §10(b) of the Securities

Exchange Act of 1934[1] and was modeled upon §17(a) of the Securities Act of 1933, 15 U.S.C. §77q(a). Commissioners' Note, §101,7 U.L.A. 695-96. *See also,* Draftsmen's Commentary to §101, *L. Loss, Commentary on the Uniform Securities Act* 6-8 (1976).

The equivalent to section 11-51-124 is §409 of the Uniform Securities Act. 7 U.L.A. 768. The Commissioner's Note as to §409 refers to his comment under §204(a)(2)(B) for the definition of "willfully." This reads:

"Clause (B): As the federal courts and the SEC have construed the term 'willfully' . . . all that is required is proof that the person acted unintentionally in the sense that he was aware of what he was doing. Proof of evil motive or intent to violate the law, or knowledge that the law was being violated, is not required. The principal function of the word 'willfully' is thus to serve as a legislative hint of self-restraint to the Administrator."

Thus, "awareness" and its twin, "knowingly," are the essence of "willfully."

In its definitions, as already noted, the court stated that a person acts "knowingly" when he is aware, or reasonably should be aware, that his conduct is of a certain nature or that certain circumstances exist. The portion of the instruction stating "reasonably should be aware" should not have been included. As a result, we are confronted with the question as to whether the inclusion of this clause was reversible error. Viewing the instructions as a whole, it is apparent that the thrust thereof was that, in order for the jury to convict the defendant, it must find that he actually knew that the statements were misleading.

 Further, it is manifest from the reading of this record that, in view of the overwhelming weight of the evidence, the defendant *knowingly* and *with an awareness* committed the acts as to which he was found guilty. In considering the gravity of the error of the clause, "reasonably should be aware," we feel it not improper to draw an analogy to the holding in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). There it was stated that, for a constitutional error to be considered not prejudicial, the reviewing court must declare that "it was harmless beyond a reasonable doubt." Similarly, here we conclude that, considering the overwhelming evidence and the thrust of the instructions, on an overall basis the error was harmless beyond a reasonable doubt.

The defendant assigns error to the refusal to give the following specific intent instruction:

"The crime charged in this case is a serious crime which requires proof of specific intent before the defendant can be convicted. Specific intent, as

---

[1] 15 U.S.C. §78j(b). *See generally, Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

the term implies, means more than the general intent to commit the act. To establish specific intent, the government must prove that the defendant knowingly did an act which the law forbids, (or knowingly failed to do an act which the law requires,) *purposely intending to violate the law*. Such intent may be determined from all the facts and circumstances surrounding the case." (emphasis added)

We indicate first that the type of "specific intent" contended for by the defendant is not required for these criminal offenses. There is no requirement that the defendant purposely intended to violate the law in order to be held criminally liable. *See United States v. Charnay*, 537 F.2d 341 (9th Cir. 1976); *United States v. Peltz*, 433 F.2d 48 (2d Cir. 1970); *State v. Russell*, 119 N.J. Super. 344, 291 A.2d 583 (1972). *See generally, Arthur Lipper Corp. v. S.E.C.*, 547 F.2d 171 (2d Cir. 1976); *Tager v. S.E.C.*, 344 F.2d 5 (2d Cir. 1965).

With regard to these securities law violations the use of the term "specific intent" confuses matters and adds little or nothing productive or illuminating. *See, e.g., State v. Cox*, 17 Wash. App. 896, 566 P.2d 935 (1977). Thus, we disapprove of its use in securities cases and indicate that in the future instructions given in section 11-51-124 cases are to be phrased only in terms of "knowingly," "willfully," and "aware." As an example, a person criminally violates section 11-51-123(b) if he is *aware* that he is making any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

The defendant asserts error by reason of the court's failure to give the following instruction on "good faith":

"You are instructed that good faith and and honest purpose on the part of the Defendant is an *absolute defense as to charges of security fraud*. It matters not how visionary you may find the Defendant's enterprises to be, or how unreasonable the prospects for success in any of the enterprises referred to in the evidence may seem to you, if the defendant actually believed in them. Promises made in good faith, whether they be glittering or attractive or not, are not criminal. If, therefore, you believe that the representations made by the Defendant, although glittering, attractive, persuasive and alluring, were made in good faith, and not as a part of a deliberate plan or scheme to defraud, then it is your duty to find the Defendant not guilty." (emphasis added)

Good faith is not a proper defense in this case. *See United States v. Pomponio*, 429 U.S. 10, 97 S.Ct. 22, 50 L.Ed2d 12 (1976).

## II.

The defendant contends that, if we define "willfully" as essentially "knowingly" it renders the felony involved here (sections 11-51-123 and 124, C.R.S. 1973) indistinguishable from the misdemeanor outlined in section 18-5-301(1)(f), C.R.S. 1973. The defendant contends that this is a

violation of equal protection, relying on *People v. Calvaresi,* 188 Colo. 277, 534 P.2d 316(1975).

The felony sections here involved, 11-51-123 and 124, are a part of the Uniform Securities Act. This Act was adopted by Colorado in 1961. Colo. Sess. Laws 1961, ch. 232, 125-10-1 *et seq.* at 731. Section 18-5-301, C.R.S. 1973 was not enacted until 1971. Colo. Sess. Laws 1971, ch. 121, 40-5-301 at 441-42. The Uniform Securities Act is an extensive and coherent scheme for state regulation of securities. *See* 7 U.L.A. 691.

Section 18-5-301(1)(f), C.R.S. 1973 provides:
"Fraud in effecting sales. (1) A person commits a class 2 misdemeanor if, in the course of business, he knowingly:
"(f) Makes a false or misleading written statement for the purpose of *promoting* the sale of securities, or omits information required by law to be disclosed in written documents relating to securities." (emphasis added)

■ It is inconceivable that the General Assembly could have intended to substitute section 18-5-301(1)(f), C.R.S. 1973 for one of the most essential sections of the Uniform Securities Act. We must, therefore, examine section 18-5-301 to see if it could be intended to serve any function not already performed by the Uniform Securities Act. In contrast to the "promoting" language of 18-5-301(1)(f), it should be noted that 11-51-123 applies "in connection with the *offer, sale,* or *purchase* of any security." (emphasis added) "Offer" is defined as "every attempt to dispose of, or *solicitation of an offer to buy,* a security" (emphasis added). Section 11-51-102(8)(b), C.R.S. 1973. Thus we must conclude that the General Assembly's intent with regard to 18-5-301(1)(f) was to reach acts which constitute "promoting" the sale of securities but which do not reach the level of a "solicitation of an offer to buy."

■ Given this construction of 18-5-301(1)(f) as dealing with matters not included within the ambit of 11-51-123 (b), there is no violation of equal protection unless the classification is arbitrary or unreasonable. *People v. Hines,* 194 Colo. 284, 572 P.2d 467 (1977); *People v. Sexton,* 194 Colo. 250, 571 P.2d 1098 (1977); *People v. Czajkowski,* 193 Colo. 302, 568 P.2d 23 (1977); *People v. Hulse,* 192 Colo. 302, 557 P.2d 1205 (1976). It is not arbitrary or unreasonable to provide a greater penalty for misrepresentations of facts in connection with an actual solicitation of an offer to buy, a greater offense, as opposed to mere promotion, a lesser offense.

### III.

The defendant also questions whether certain trust arrangements constituted "securities" subject to our Securities Act. These trust arrangements were the basis for counts 3, 4, 7, 8, 9 and 10.

Some explanation of the facts concerning the trust arrangements is necessary to understand the discussion of this issue. As an example, the Bickford-Easterday trust involved in counts 3 and 4 was an irrevocable

trust under which the settlors, Thelma Jane Bickford and Cora Alice East-erday, were to receive the income for life, with the remainder to Life Center, Inc. There were three trustees: the defendant, Wendell Nance and Harvey E. Rhodig. A separate written agreement guaranteed the settlors a 9% annual return on their investment.

The trust agreement provided that the trust was to be administered free from the active supervision of any court and that no trustee should be responsible for the acts or omissions of a co-trustee or for allowing a co-trustee to have custody or control over any of the trust assets. Each trustee was to be responsible only for his acts or omissions in bad faith. The agreement further provided that any trustee could be removed with or without cause by the Board of Directors of Calvary Temple, Inc. The Board of Directors of Calvary Temple, Inc. had the sole power to fill vacancies among the trustees. The settlors had no right whatsoever to either remove trustees or to fill vacancies. In addition, a clause in the agreement provided as follows:

"*POWERS OF THE TRUSTEES.* The settlors grant to the Trustees discretion and complete power to administer the trust estate. In addition to those powers now or subsequently considered by law, such grants shall include without limitation the following powers:
* * * *

"*To deal with the Trustees, individually and as fiduciaries, or with any organization in which the Trustees may have an interest,*" (emphasis added)

Almost immediately after receiving the trust principal, the trustees "invested" a substantial portion of it in securities of the three corporations, Life Center, Inc., Calvary Temple, and The Charles E. Blair Foundation. In the case of the Bickford-Easterday trust, this amounted to a $20,000 note receivable from Life Center and a $10,000 note receivable from The Charles E. Blair Foundation. There was no indication to the settlors that their principal was to be invested in unsecured notes receivable of insolvent corporations.

On March 1, 1973 an attorney for Life Center, Inc. wrote to the defendant:

"I am very much afraid that in the view of the SEC the purported borrowing of the money from the three of you as trustees will be simply a cover-up to the continued sale of securities to public investors. Do the persons for whom you are acting as trustees know that you are investing the money in Life Center notes? If they do, it is further evidence of the fact that you are engaged in a continuous offering of the Life Center securities, and that the money is being channeled through the three of you as trustees, possibly as a subterfuge to the commitment given to the SEC that Life Center would not make any further sales of securities. If the people providing the money to you as trustees do not know that you are investing

it in the Life Center secruities, then there may be a very serious liability to them for the investment of the funds in this venture, and there may again be an assertion of subterfuge in connection with the issuance of Life Center securities. In short, I must say that I believe the continued raising of funds by Life Center by means of the 'trustee notes' is not in compliance with the commitments made to the Securities and Exchange Commission."

As late as April 8, 1974 the defendant was writing letters of the following content to the settlors of these trusts:

"In reply to your letter of March 26, 1974 we are pleased to inform you that the Calvary Temple Board has appointed a new Trustee to serve all Trust holders. You will be informed in the very near future of this addition which we feel will be a strength to the proper management and that of your Trust Corpus.

"As you know your money was invested in different segments of the Charles E. Blair ministries, and we are anticipating an appropriate return from these organizations in the coming year as in the past year.

"I would encourage you to leave your money where it is."

To repeat, the question is whether the trusts constituted the sale of a "security." "Security" is defined in section 11-51-102(12) as:

"'Security' means any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral-trust certificate; preorganization certificate of subscription; transferable share; investment contract; voting-trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under such a title or lease; or, in general, any interest or instrument commonly known as a 'security' or any certificate of interest or participation in, temporary or interim certificate for, guarantee of, or warrant or right to subscribe to or purchase any of the foregoing."

This definition is from §401 of the Uniform Securities Act. 7 U.L.A. 746. It in turn is identical with §2(1) of the Securities Act of 1933. 15 U.S.C. §77b(1). *See* Commissioners' Note, 7 U.L.A. 749.

■ The evidence in this case was sufficient to support a jury finding that these trust arrangements were, in fact, "securities" within the meaning of our Securities Act.

The defendant's primary contention is that these arrangements do not satisfy the "common enterprise" element required by the *S.E.C. v. W.J. Howey,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), definition of a security. That definition is:

"[A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person *invests his money in a common enterprise* and is led to expect profits solely from the efforts of the promoter or a third party . . . ." (emphasis added)

The jury had more than adequate evidence to support a finding that these trusts were conduits for investment in the three Blair corporations. The effect of the Bickford-Easterday trust was little more than the purchase of 9% notes from the Blair corporations. The case of *S.E.C. v. Heritage Co.,* 402 F. Supp. 744 (D. Ariz. 1975), is strikingly similar. Similar trust with similar purposes were marketed in that case and the question was raised as to whether the trusts constituted securities under the Securities Act of 1933. The court in that case found that true fiduciary services were neither sold nor furnished. Thus the court held that the trust constituted "investment contracts." The court stated:

"The most essential consistency in the cases which have considered the meaning of the term 'investment contract' is their emphasis on whether or not the investor has substantial power to affect the success of the enterprise. When the investor is relatively uninformed and then turns over his money to others, essentially depending upon their representations and their honesty and skill in managing it, the transaction is generally considered to be an investment contract."

We agree, and thus find the trusts involved in this case to be investment contracts. *See also S.E.C. v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476 (9th Cir. 1973) *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53.

In the instant case, to say that "fiduciary" services were provided is to ignore all the connotations of the term. The trustees clearly had no sense of fiduciary obligation and, in fact, wrote the trust agreements so as to absolve themselves of as much fiduciary obligation as possible. They had little concern for the settlors' economic welfare, as evidenced by the fact that they almost immediately invested much of this money in insolvent corporations in which they had an interest. Their awareness of the impropriety of this is evidenced by a letter containing a legal opinion requested by trustee Nance, a copy of which letter was received by the defendant on January 9, 1973.

"The trustees have in the past, and continue now, in the practice of lending money to Life Center and Calvary Temple as various needs arise. This constitutes a breach of trust because two of the trustees are financially interested in these organizations by means of salaries or other advantages."

IV.

■ The defendant also raises a question as to whether the admission into evidence of a letter of March 14, 1972 from the S.E.C. to Life Center, Inc. is reversible error. Relevant sections of the letter stated:

"It should also be pointed out that it is our position, based on a review of the September 30, 1971 financial statements, Life Center, Inc. is operating a Ponzi scheme; that is, raising funds from the sale of debt securities to the public at a time when it is insolvent and making interest payments on those securities out of principal. The operation of a Ponzi scheme

violates the antifraud provisions of the federal securities laws (Section 17(a) of the Securities Act of 1933, as amended, 15 U.S.C. 77q(a), and Section 10(b) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. 78j(b), and Rule 10b-5 adopted thereunder, 17 CFR 240.10b-5)."
The defendant contends that it was error to admit this letter into evidence, as it contained an opinion as to the defendant's guilt. The defendant objected at the trial and, as a result, before the letter was introduced into evidence the court instructed the jury:

"The objection will be overruled and the jury is instructed that the Defendant is on trial here only for alleged violations of the Colorado Securities Act and he is not on trial here for any alleged violations of the Federal Securities Law or any other law and you are not to consider any reference to the Federal Securities Law or for any purpose whatsoever as bearing on the guilt or innocence of this Defendant."

The essence of the defendant's argument appears to be related to the fact that, prior to the admission of this letter, Warren Charles, former house counsel for Life Center, Inc., had testified that the disclosure provisions of the federal and state securities law were identical. Thus defendant contends that the letter amounts to a legal opinion as to his guilt on these state charges.

We find no merit in this contention. The limiting instruction was adequate to indicate that the defendant was not being charged with any federal crimes and that any reference to the federal securities law had no bearing on the ultimate guilt or innocence of the defendant. This limiting instruction was adequate to dispel any notion that this letter was an opinion on the issue of the defendant's guilt on these state charges.

We also note that this letter is very different from the type of situation in which an expert witness is called simply to give his opinion as to situations otherwise existing in the case. This letter is admissible because it has independent significance in terms of weight going to what the defendant's state of awareness was at a given time. As such, the letter was properly admissible. The limiting instruction constituted sufficient protection against improper determinations as to the dispositiveness of the S.E.C. statements.

## V.

The defendant also makes various contentions both with regard to election as between counts and merger of various counts.

The first group of these contentions deals with the question of what effect section 18-1-408(1)(d) has upon the interplay between count 1 and counts 2-17. The argument is that count 1 (violation of 11-51-123(c)) is merely a general version of counts 2-17 (violations of 11-51-123(b)) and thus, by virtue of 18-1-408(1)(d), C.R.S. 1973, the defendant can only be convicted on either count 1 or counts 2-17, when the counts arise from the same transactions.

We disagree with the defendant's contention. Section 18-1-408(1)(d) provides:

"(1) When any conduct of a defendant establishes the commission of more than one offense, the defendant may be prosecuted for each such offense. He may not be convicted of more than one offense if:

\* \* \* \*

"(d) The offenses differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct."

Section 408(1)(d) is intended to deal with situations where the offenses themselves are *defined* in terms of general and specific kinds of conduct. Subsections 11-51-123(b) and (c) are not so defined. Rather, subsection (b) deals with untrue statements of material facts or failure to state material facts, while subsection (c) deals with engaging in an act, practice, or course of business which operates as a fraud or deceit. While it is clear that, as in the case at hand, a violation of one may also be a violation of the other, the offenses are not defined as general and specific versions of the same course of activity.

The defendant's remedy in a case such as this, where the two sections do overlap and the evidence is identical, is to move for an election as between counts as provided for by section 18-1-408(3). No such application was filed in this case. Thus, he is limited to the remedy of concurrent sentencing. Section 18-1-408(3), C.R.S. 1973.

On this appeal, the People have conceded that since the convictions on 1 and 2-17 were based on the identical evidence, any sentence should be concurrent. Section 18-1-408(3), C.R.S. 1973. The parties have cited no authority on the question of the effect the concurrent sentencing doctrine has when a person is only fined and sentence is deferred subject to probation. The interests involved in allowing a person to serve actual jail sentences concurrently are quite different from those involved in the payment of fines. In fact, in common usage, the word "sentencing" refers only to actual jail sentences, while fines are commonly considered "punishment" rather than "sentence." In fact, the judgment granting probation states that the defendant's "sentence" is suspended. We, therefore, determine that although the defendant was to be concurrently "sentenced" this has no effect on his fines for separate counts.

The defendant further contends that certain of the counts arose from only one coordinated financial transaction or one sale of a security and thus should be merged. Particularly, these claims concern counts 3 and 4 dealing with the Bickford-Easterday trust and counts 5, 7, 8, 9 and 10 dealing with the Cavett financial transactions. The defendant attempts to characterize each of these groups of counts as separate installment payments on a single purchase of a security. That is, he claims that counts 3 and 4 deal with separate installments of $35,000 and $10,000 on one

single investment of $45,000 in a trust account. He likewise contends that the other counts are separate installments in one trust account investment of $30,000.

We agree with the defendant that if these separate transactions were, in fact, installment payments on one contract to purchase a security and there were no separate representations made at the time of each payment, then there could only be one conviction under both the meaning of section 11-51-123, C.R.S. 1973 and the rule of 18-1-408(1)(e), C.R.S. 1973. That is, in a situation where the defendant and victim enter into a binding contract for the sale of one share of stock, price to be paid in four installments, and no further meetings are had or representations made and the victim mails in his four installments, there can only be one count and not four. Here, however, the two situations are open-end trust agreements, into which the investors could deposit as much or as little money as they wished and the defendant could not compel them to make further payments or pay a full contract price. Each installment was essentially a new and separate investment decision for the investor. The making of another payment is analogous to a separate purchase of an additional share of stock. Thus, each payment must be considered separately to determine if, at that time, a new misrepresentation is made or if the defendant should realize that old misrepresentations which, of course, he has an affirmative duty to clarify, continue to affect the victim's decisions. If either is true, a separate conviction can be based on each payment.

In this case there is no claim that the defendant had any purported contractual right to each payment or that the investor could not freely refuse to make the payments. Given the continuing misrepresentations, it was not improper to base a separate conviction on each payment.

## VI.

The defendant has raised other contentions. We find them without merit and mention only two here. He contends that as to certain counts he cannot be properly held accountable as an accessory. In effect, the defendant is contending that in order for him to be held liable on some of these counts, the requirements of section 18-1-603, C.R.S. 1973 must be satisfied.

"Complicity. A person is legally accountable as principal for the behavior of another constituting a criminal offense if, with the intent to promote or facilitate the commission of the offense, he aids, abets, or advises the other person in planning or committing the offense." Section 18-1-603, C.R.S. 1973.

This is a creative attempt to graft accessory law onto securities law. However, no such transplant is possible in this case. The defendant is not being held liable under an accessory theory; rather, he is being held liable directly as a principal. Section 11-51-123 provides that:

"It is unlawful . . . *indirectly:*
* * * *
"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading;" (emphasis added)

The defendant here is not being held liable as an accessory to indirectly making an untrue statement of a material fact; rather, he is being held liable as a principal who indirectly made an untrue statement of a material fact. *See Queen v. Commonwealth,* 434 S.W.2d 318 (Ky. App. 1968); *cf. United States v. Amick,* 439 F.2d 351 (7th Cir. 1971). Thus, accessory theory is not applicable to this case.

There are, of course, limits as to how much connection with the transaction is necessary to constitute "indirectly" making a misrepresentation. Where, however, there is evidence, such as is present in this case, of a general mode of doing business over which the defendant has strong overall control, it is not difficult to find that the defendant indirectly makes those representations which are conveyed by his sales representatives. This is especially true where there is evidence that the defendant, as here, both fails to disclose and makes affirmative misrepresentations to those salesmen. *See Queen v. Commonwealth, supra.*

Any prosecutorial misconduct which may have taken place was not sufficiently egregious to warrant reversal.

Judgment affirmed.

MR. JUSTICE ERICKSON dissents. MR. JUSTICE CARRIGAN does not participate.

MR. JUSTICE ERICKSON dissenting:

I respectfully dissent. Error occurred in this case, and in my opinion, it was not harmless. The standard applied to constitutional error in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1976), is not applicable to the issues in this case. The defendant was entitled to have a properly instructed jury determine his guilt or innocence.

The defendant contends that the statutory terms "willful" or "knowingly" do not include "reasonably should be aware." I agree. The majority opinion concludes that the jury determined that the defendant actually knew that the statements were misleading. Such a conclusion places this court in the position of being the omnipotent jury. Since the jury was not properly instructed, I would reverse and remand for a new trial.