The **PEOPLE** of the State of Colorado, Plaintiff-Appellee,

v.

Ralph A. **MORROW**, Defendant-Appellant.

No. 82CA0651.

Colorado Court of Appeals, Div. II.

Nov. 10, 1983.

Rehearing Denied Dec. 8, 1983.

Certiorari Denied May 7, 1984.

Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Joel W. Cantrick, Sp. Asst. Atty. Gen., John Milton Hutchins, Asst. Atty. Gen., Denver, for plaintiff-appellee.

David F. Vela, Colo. State Public Defender, Michael J. Heher, Deputy State Public Defender, Denver, for defendant-appellant.

METZGER, Judge.

Defendant, Ralph A. Morrow, Kay Robohm, and others were indicted by the Denver County Grand Jury in 1981. The indictment alleged several counts against Morrow arising in connection with his activities with Nokomis, Inc., a Colorado corporation. Trial was to the court, and at the close of the evidence the trial court granted Morrow's motion for judgment of acquittal as to Count 1 (Theft), denied that motion as to both remaining counts, and entered judgments of conviction on Count 2, sale of an unregistered security in violation of § 11-51-106, C.R.S.1973, and on Count 3, fraud in connection with the sale of a security in violation of § 11-51-123 and § 11-51-124, C.R.S.1973. On appeal, Morrow contends the trial court erred in convicting him of Counts 2 and 3. We reverse defendant's conviction as to Count 2 and affirm the trial court's determination as to Count 3.

## BACKGROUND

During the spring of 1978, Morrow contacted Thomas Patston, a financial advisor having extensive experience in the investment field. Patston was president of First American Financial Group, Inc., a company engaged in financial and tax planning, insurance, and having some involvement in oil and gas. Morrow told Patston he had recently joined and become president of Nokomis, Inc., a company involved in oil and gas production. Morrow and Patston had been acquainted for several years, and had worked together on various investment projects.

During the course of their original conversation, Morrow told Patston that Nokomis was attempting to acquire some capital. During several subsequent conversations, Morrow explained the operations of Nokomis to Patston, provided him with substantial documentation regarding Nokomis, its officers and directors, and discussed the proposed capital acquisition program.

Most, if not all, of the information provided to Patston by Morrow had originally been provided to Morrow by Kay Robohm, Chairman of the Board of Nokomis. Morrow had known Robohm for almost 20 years, and Robohm had persuaded Morrow to come to work for Nokomis. Shortly before Morrow contacted Patston, Robohm had told Morrow that Nokomis owned producing oil wells in several states. Morrow, in verifying that information, had personally viewed producing oil wells in Chanute, Kansas, with Robohm. It later developed that Robohm owned the wells but had not transferred his interests to Nokomis, notwithstanding his representations to Morrow and to Patston that he had done so. There was no question at trial that these were producing oil wells. Morrow had independently verified several other representations made to him by Robohm prior to the time that he contacted Patston, and discovered no facts during the course of these inquiries which led him to disbelieve or further question Robohm's representations or his reliability.

During the several months he was discussing Nokomis and its operations with Morrow and Robohm, Patston suggested to one of his clients, 83-year-old Pearl Rhue, that she might be interested in considering an investment in Nokomis. Patston had advised Ms. Rhue for several years in financial matters and at the time of the transaction here, he was in effective control of all of Ms. Rhue's financial decisions.

Patston, as Ms. Rhue's agent, was charged by her with the responsibility to review, investigate, and make recommendations concerning the advisability of investing with Nokomis, taking into account her financial condition and needs. On Ms. Rhue's behalf he conducted an independent investigation, including an examination of Nokomis' documentation, interviews with Nokomis' officers and directors, and discussion of the proposal and details concerning Nokomis with at least two attorneys. Morrow encouraged Patston to travel to the

site of the producing oil wells he had viewed at Robohm's insistence in Chanute, Kansas, at Nokomis' expense, for the purpose of personally examining the Nokomis production. However, Patston declined to do so, stating that he was afraid to fly.

On January 11, 1979, Ms. Rhue entered into an agreement with Nokomis whereby, for the sum of $40,000, she purchased two and one-fourth barrels of oil per day from one of Nokomis' producing oil wells for the life of the well. She was to be paid these proceeds of sale, minus a pro-rata share of operating expenses, on a quarterly basis. The exact location of the producing wells was to be designated at an unspecified later date. The agreement provided that after two years she was entitled to the return of her initial $40,000 cash payment if she were dissatisfied in any way with the transaction. If Ms. Rhue elected to receive a return of the original purchase price she would still retain all quarterly revenues received from the sale of her oil. Thomas Patston, with Ms. Rhue's knowledge and consent, received a "commission" from Nokomis of $500.

There is no doubt from the record or from the trial court's findings that Ms. Rhue entered into this transaction solely upon the recommendations and encouragement of Patston. Following the execution of the agreement and payment of the $40,000, Ms. Rhue received the first quarterly payment on time, but subsequent payments were either late or in amounts less than she was due under the agreement. In 1980 payments ceased entirely. Patston contacted Morrow about these difficulties with payment, and Morrow, confronting Robohm, discovered that Robohm had not transferred his interests in the Kansas wells to Nokomis. Ms. Rhue's money had been used to drill wells on Colorado's Western Slope, as was initially contemplated and disclosed to Ms. Rhue and Patston, but the wells were not productive. Morrow attempted to repay Ms. Rhue from his own funds since by then Nokomis had no more funds, but was unable to do so. Patston then contacted the District Attorney's office; a grand jury investigation resulted in indictments against Morrow and Robohm.

## I.

The trial court found Morrow guilty of selling an unregistered security in violation of § 11–51–106, C.R.S. 1973. Morrow alleges two errors concerning this conviction.

### A.

First, he contends that the trial court misperceived the level of intent required for conviction under § 11–51–106, C.R.S. 1973, and applied a strict liability standard pursuant to *People v. Terranova*, 38 Colo. App. 476, 563 P.2d 363 (1976) rather than the "knowingly test" announced in *People v. Blair*, 195 Colo. 462, 579 P.2d 1133 (1978).

In its original findings referring to the level of intent requirement, the trial court correctly stated that the strict liability standard adopted in *People v. Terranova, supra,* was the test for conviction under § 11–51–106, C.R.S.1975, sale of unregistered securities. However, the trial court later stated that it was using the 'knowingly' standard as defined by § 18–1–501(6), C.R.S.1973, which is the standard, under *People v. Blair, supra,* applicable to the fraudulent sale of securities.

While it is unclear to us whether the trial court used a "strict liability standard" or a "knowingly" standard, Morrow was not prejudiced in either instance. If the trial court used the strict liability test it correctly applied the law as previously interpreted by this court. Alternatively, if the trial court erroneously used "knowingly," it required a higher burden of the prosecution than the charge warranted. In either instance, Morrow suffered no violation of his rights as to this issue.

### B.

Second, Morrow argues that there was insufficient evidence to support a finding of guilt because the prosecution failed to establish beyond a reasonable doubt that the sale transaction here was not included

within the statutory non-public offering exemption from registration set forth in § 11–51–114(2)(i), C.R.S.1973. We agree.

As a general proposition, the Colorado Securities Act specifically prohibits the sale of securities within this state unless and until registration with the Colorado Securities Commission has been effected. Section 11–51–106, C.R.S.1973. However, the Act provides that some types of securities and some forms of sale transactions, for one reason or another, carry an inherent degree of disclosure reliability, are not the focus of the disclosure and registration provisions of the Act, and are therefore exempt from the registration requirements. *See* § 11–51–114, C.R.S.1973.

The issue of exemption is a crucial one in this case since the availability of exemption from registration is an affirmative defense to the charge of sale of an unregistered security. Section 11–51–106, C.R.S.1973. Although there are several available exemptions to the charge of sale of an unregistered security, the exemption relied upon by Morrow at trial and in this appeal, set forth in § 11–51–114(2)(i), C.R.S.1973, as amended by Colo.Sess.Laws 1975, Ch. 107 at 415 (the statutory (2)(i) exemption), is the non-public offering exemption. It provides an exemption from the registration requirements for:

"Any transaction in this state not involving any public offering .... As used in this paragraph (i), the phrase 'not involving any public offering' means any offering where the seller reasonably believes that the securities purchased are taken for investment and not with view toward sale or resale and where each offeree, by reason of his knowledge about the affairs of the issuer or otherwise, does not require the information which would be set forth in a registration statement under this article in order to make a reasonably informed judgment with respect to such investments." Cf. § 11–51–113(2)(i), C.R.S.1973 (1982 Cum.Supp.)

The prosecution raised the issue of this exemption in its case-in-chief. Indeed, the majority of the evidence presented at trial tending to establish the availability of the statutory (2)(i) exemption was presented during direct examination of the prosecution's witnesses. The defense, primarily through cross-examination, expanded upon this theme. The prosecution presented no rebuttal evidence.

The only evidence introduced by the prosecution bearing directly upon the issue of the non-availability of a non-public offering exemption was the testimony of Royce Griffin, the Colorado Commissioner of Securities. Griffin testified that under Rule 8, Division of Securities Rules & Regulations, 3 *Code Colo.Reg.* 704–1, no exemption was available unless a request for exemption was on file with his office. He testified that a search of his records had revealed no such request by Nokomis and that he therefore concluded that no Rule 8 exemption arose. He did not testify concerning the statutory (2)(i) exemption, which was the exemption relied on by the defense.

Rule 8 is not the sole means by which it may be determined that a non-public offering exemption is available. *See* Division of Securities Rules & Regulations 8.15 and 8.32, 3 *Code Colo.Reg.* 704–1 (1977); *Lowery v. Ford Hill Investment Co*, 192 Colo. 125, 556 P.2d 1201, 84 A.L.R.3d 997 (1976); *see also* Kinderman, *The Private Offering Exemption: An Examination of its Availability Under and Outside Rule 146*, 30 *Bus.L.* 921 (1974).

■ Because the Commissioner's testimony was limited solely to the notice filing requirement of Rule 8, his testimony sheds no light on whether the requirements of the statutory (2)(i) exemption, in contradistinction to the rule exemption, were met. Indeed, proof of noncompliance with the Rule 8 notice requirement has no bearing on the availability or nonavailability of the *statutory* non-public offering exemption. Thus, the failure of Nokomis to qualify under the Rule 8 notice-filing requirement for exemption from registration does not preclude it from qualifying under the general statutory (2)(i) exemption.

The availability of the statutory (2)(i) exemption is a question of fact to be determined upon consideration of all surrounding circumstances. *Lowery v. Ford Hill Investment, Co., supra; Central Bank & Trust Co. v. Robinson,* 137 Colo. 409, 326 P.2d 82 (1958). And, the initial focus for the availability of this statutory (2)(i) exemption must turn upon the qualifications of all offerees as a group and not upon the peculiar characteristics of a single investor. *Lowery v. Ford Hill Investment Co., supra.*

Here, the only evidence which related to investors other than Ms. Rhue arose from the testimony of Patston, and established that Kay Robohm's father also invested funds with Nokomis. The record is devoid of evidence, however, from which it could be determined when Robohm's father made his investment, whether it was similar to Ms. Rhue's, or if any other factors existed from which the trial court could have determined whether Robohm's father's investment was part of the same offering in which Ms. Rhue participated. *See SEC v. Ralston Purina Co.,* 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953); *Andrews v. Blue,* 489 F.2d 367 (10th Cir.1973); *Lowery v. Ford Hill Investment Co., supra.* Since the prosecution failed to establish the existence of other investors in the same offering in which Ms. Rhue participated, the "group of offerees" whose qualifications must be analyzed in this case in order to determine the availability of the statutory (2)(i) exemption is limited to Ms. Rhue and Patston.

The trial court found that all elements of the statutory (2)(i) exemption, had been met except that portion stating:

> "where each offeree, by reason of his knowledge about the affairs of the issuer or otherwise, does not require the information which would be set forth in a registration statement under this article in order to make a reasonably informed judgment with respect to such investments."

The trial court concluded that:

> Miss Rhue is not one of those persons who is sophisticated enough in these transactions. In fact, it's probable that she had never invested in any such transaction prior to this time ...."

Although the evidence completely supports the trial court's finding as to Ms. Rhue alone, that finding fails to acknowledge that she made this purchase based on the investment judgment of Patston, her financial advisor.

An agent is one who acts for or in place of another by authority from him. *Pouppirt v. Greenwood,* 48 Colo. 405, 110 P. 195 (1910). Ordinarily, the question of the existence of an agency relationship is a question of fact. *Marron v. Helmecke,* 100 Colo. 364, 67 P.2d 1034 (1937). But if, as here, there is no dispute or conflict in the facts which could be interpreted to have created the agency, the court should determine that question as a matter of law. *Smith v. Davis,* 67 Colo. 128, 186 P. 519 (1920); *Lester v. Synder,* 12 Colo.App. 351, 55 P. 613 (1898). *See also Butler v. Colorado International Pancakes, Inc.,* 510 P.2d 443 (Colo.App.1973) (not selected for official publication).

The uncontradicted evidence at trial established Patston as Ms. Rhue's agent, based on their longstanding relationship, and showed his investigation to be within the scope of his authority as established by that pre-existing relationship and by her instructions to him to investigate the proposed transaction. *Pouppirt v. Greenwood, supra,* and *Marron v. Helmecke, supra.*

In *Weghorst v. County Fire Insurance Co.,* 96 Colo. 564, 45 P.2d 625 (1935), the court held:

> "[T]he rule, established in this as well as other jurisdictions, is, that the knowledge of the agent is knowledge of the principal, when the agent acts within the scope of his authority."

Hence, the knowledge that Patston obtained during his lengthy course of inquiry, coupled with his financial experience in various types of investments, as well as the extent to which information was made

available to him, must be imputed to Ms. Rhue as the principal. *See West Denver Feed Co. v. Ireland,* 38 Colo.App. 64, 551 P.2d 1091 (1976); *Restatement (Second) of Agency* § 9.3 (1958); *Oro Mining & Milling Co. v. Kaiser,* 4 Colo.App. 219, 35 P. 677 (1894). Consequently, Patston and Ms. Rhue's combined knowledge, expertise, and experience should have been considered together in order to make a determination pursuant to the statutory (2)(i) exemption language whether they, considered as a single offeree, required the information which would have been set forth in a registration statement in order to make a reasonably informed judgment about the proposed purchase.

The agency concept and its application to securities transactions appears in United States Securities & Exchange Commission Rule 146, 17 C.F.R. 230.146 (1982), and was adopted as part of Colorado law by rule of the Colorado Division of Securities. Colorado has adopted the concept of offeree-representative, discussed in Rule 146, *supra,* in Rule 8.16, Division of Securities Rules & Regs., 3 *Code Colo.Reg.* 704–1. Offeree-representatives are agents of the purchasers of securities, with all the duties and responsibilities attendant to that relationship. Unlike other agents, however, offeree-representatives are specifically authorized to receive commissions from offerors but are, nevertheless, considered to be agents of the offerees in securities transactions, Rule 146, *supra.* Thus, the fact that Patston received a "commission" from Nokomis does not alter or affect his status as Ms. Rhue's agent.

In this case, the prosecution's evidence raised the affirmative defense that Ms. Rhue, with the advice and knowledge of Patston as her agent, was the type of offeree who did not require the information normally set out in a registration statement.

Once the prosecution raised the issue of this affirmative defense, it assumed the burden of proving beyond a reasonable doubt that the affirmative defense was not applicable. Section 18–1–407(2), C.R.S.1973 (1978 Repl.Vol. 8) provides:

> If the issue involved in an affirmative defense is raised, then the guilt of the defendant must be established beyond a reasonable doubt as to that issue as well as all other elements of the offense.

Substantial testimony was received which showed that Patston was knowledgeable about investments in general, had some experience in oil and gas matters, was afforded several opportunities to make inquiry of Nokomis representatives, was provided virtually unlimited access to Nokomis' documents, reviewed the potential investment with at least two attorneys (one of whom had previously represented Nokomis), and was encouraged to conduct a physical examination of Nokomis properties. The prosecution introduced no evidence to refute or to question Patston's qualifications, experience, or knowledge about the affairs of Nokomis, his ability to assimilate the information provided to him, or his ability to ferret out information material to a decision to invest in Nokomis.

 Therefore, since there was insufficient evidence to serve as a basis for Morrow's conviction, the prosecution failed to meet its burden of proving beyond a reasonable doubt that the Rhue-Patston offeree, or any other offeree, was unable to make a reasonably informed investment decision in the absence of a registration statement. Accordingly, Morrow should not have been convicted of the charge of sale of an unregistered security.

## II.

As to his conviction of fraud in connection with the sale of a security, Morrow contends that the evidence was insufficient to prove beyond a reasonable doubt that he willfully made false statements in violation of § 11–51–123(1)(b), C.R.S.1973. We disagree.

Section 11–51–123, C.R.S.1973, states:

> "(1) It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly:

. . . .

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading. . . ."

The trial court's findings must remain undisturbed if there is sufficient evidence in the record to support them. *People v. Storey*, 191 Colo. 546, 554 P.2d 694 (1976). Here, notwithstanding Morrow's testimony to the contrary, there was evidence from a Grand Jury investigator that Morrow admitted making misleading statements in connection with this sale. There was no contention by defendant that this transaction did not involve the sale of a security, and the record contains ample evidence supporting the trial court's determination.

Accordingly, the judgment of conviction as to sale of an unregistered security is reversed and we remand to the trial court with directions to enter a judgment of acquittal. The judgment of conviction as to fraud in connection with the sale of a security is affirmed.

ENOCH, C.J., and STERNBERG, J., concur.