Monica C. BEYER, Thomas O. Beyer, Lisa Marie Beyer, Gregory Laird Beyer, Kevin Robert Beyer (by his next friend, Thomas O. Beyer), Joan B. Morris, Todd Morris, and Robin Morris (by his next friend, Joan B. Morris), Plaintiffs–Appellants and Cross–Appellees,

v.

FIRST NATIONAL BANK OF COLORADO SPRINGS, a national banking association, Defendant–Appellee,

and

United Bank of Colorado Springs, a national banking association, Defendant–Appellee and Cross–Appellant.

No. 90CA0481.

Colorado Court of Appeals, Div. IV.

June 4, 1992.

Rehearing Denied July 23, 1992.

Certiorari Denied Jan. 19, 1993.

Thomas C. Henley, Robert Dunlap, P.C., Robert Dunlap, Colorado Springs, for plaintiffs-appellants and cross-appellees.

Sparks, Dix, Enoch & Winslow, P.C., Kenneth Sparks, Mark E. Winslow, Colorado Springs, for defendant-appellee.

Holme Roberts & Owen, William S. Huff, James T. Flynn, Walter H. Sargent, Colorado Springs, C. Jean Stewart, Denver, for defendant-appellee and cross-appellant.

Opinion by Judge METZGER.

In this action concerning the Robert Beyer Family Trust, the plaintiffs, as beneficiaries of that trust, sought recovery for losses sustained as a result of defendants, First National Bank of Colorado Springs (First National) and United Bank of Colorado Springs (United Bank), the trustees of the trust, having pursued an aggressive, risky investment policy. Ruling principally on the basis that plaintiffs had knowingly

consented to the investment policy, the trial court entered judgment for defendants. Plaintiffs appeal, and we affirm.

Robert Beyer, a founding member and managing partner for many years of Touche Ross & Company, established the trust here at issue in 1973. Its beneficiaries were his wife, Monica Beyer, and the living descendants of Robert Beyer. These beneficiaries are the plaintiffs in this action and include his wife, children, and grandchildren.

The trust was to be funded with $2 million in cash payments received from Robert Beyer's deferred compensation retirement plan over a 10–year period beginning in 1978, and income and principal were distributable in the trustee's discretion. The trust was irrevocable, and was to continue so long as any of the descendants of Robert Beyer living at the time of his death were alive or had not yet reached the age of 35. The purpose of the trust was to provide for the care, comfort, and support of Mr. Beyer's children and grandchildren, and to avoid probate.

In 1978, upon the death of Robert Beyer, Colorado Springs National Bank (CSNB), predecessor in interest to defendant United Bank, was named trustee.

In the late 1960's and up to the time of his death, Robert Beyer had developed a strong friendship with his son-in-law Richard Morris, who married Joan Beyer in 1963. Richard Morris was the principal owner of Financial Planning Services, Inc., one of the pioneer fee-based financial planning programs, and he was recognized as an expert in financial planning for persons of wealth. Robert Beyer confided in Richard Morris concerning various matters relating to personal finances.

It was Richard Morris who introduced Robert Beyer to the Colorado law firm of Kraemer and Kendall. Sandy Kraemer of that firm worked closely with Richard Morris and the Beyers in preparing the Beyer's estate plan and drafted the wills and the trust documents as well. After the death of Robert Beyer, the firm continued to provide general legal services to Monica Beyer and acted as legal counsel in the administration of Robert Beyer's estate. Most of the legal work in this regard was done by William Bowman, who had joined the firm in 1977 as a specialist in tax, estate planning, and business matters.

From the time of Robert Beyer's death until 1982, CSNB held the trust investments in tax-exempt funds and other money market instruments. This investment strategy was in keeping with the rather broad grant of powers set forth in of the trust agreement which provided:

> In administering any Trust under this Agreement, Trustee may exercise the following powers: hold, retain, invest, reinvest and manage without diversification as to kind, amount or risk of nonproductivity in realty or personalty and without limitation by statute or rule of law; partition, sell, exchange, grant, convey, deliver, assign, transfer, lease, option, mortgage, pledge, abandon, borrow, loan, contract, distribute in cash or kind or partly in each at fair market value on the date of distribution and without requiring pro rata distribution of specific assets, hold in nominee form, continue businesses, carry out agreements, deal with itself, other fiduciaries and business organizations in which fiduciaries may have an interest, establish reserves, release powers, and abandon, settle or contest claims.

The trust agreement further provided that the trustee was authorized to exercise all powers enumerated in the Colorado Fiduciaries' Powers Act, § 15–1–801, et seq., C.R.S. (1987 Repl.Vol. 6B).

Until late 1981, CSNB made all the decisions affecting the administration of the trust, and would consult from time to time with the Beyer family law firm regarding investment policy. In this capacity, CSNB adhered to the standard of the "prudent person" rule, adopting what it termed a "sound program of diversification which will consider: The terms of the trust instrument; the purpose of the trust; the present and potential size of the account; consideration of appropriate alternate investments; and tax consequences."

That policy began to change in the latter part of 1981, when William Bowman, the family attorney and CPA for the estate of Robert Beyer, and Richard Morris, husband of beneficiary Joan Morris, commenced discussions with CSNB. These discussions focused on the fact that certain tax law changes would likely cause the trust to have to pay income tax at a 50–percent rate on the Touche Ross payments it was scheduled to receive through 1988. As a result of their concerns, Bowman and Morris sought a revision of CSNB's investment policies.

In May of 1982, Morris and Bowman sent to CSNB their analysis in support of modifying the trust's investment policies. By this analysis, Morris and Bowman proposed to have the sizeable sums in the trust assets invested or reinvested in certain "tax-favored alternatives" designed to alleviate the potential losses to income taxes. Specifically, two limited partnership investments were recommended: one a developmental oil and gas drilling fund, and, the other, an equipment leasing arrangement. In conjunction with the submission of these proposed investments to CSNB, Morris and Bowman sent letters to the beneficiaries informing them that the bank had given preliminary approval to the concepts contained therein and had requested execution of consents to selection of the new investment program.

The record shows that CSNB evidently understood, and the trial court so found, that in all matters relevant to the reformation of the trust investment program, Bowman was acting as the agent of the trust beneficiaries and Morris was "a messenger and promoter of investments" for them. Both Monica Beyer and Thomas Beyer testified that they were apprised by Morris and Bowman concerning the possibility that the trust assets would be depleted by taxes, that they were relying on information provided by Morris and Bowman in whom they had full confidence, that they knew Morris and Bowman were meeting with representatives of CSNB for the purpose of seeking approval of an alternate investment strategy on behalf of the beneficiaries, that they knew Morris had undertaken to evaluate and recommend specific investments, and that they were aware, as well, that Morris and Bowman had together prepared a formal written analysis of cash flow and income tax projections to illustrate the new investment strategy which reflected the wishes and desires of the beneficiaries in regard to the trust. This testimony showed that CSNB was thus led to believe that the beneficiaries had been provided with adequate information and were sufficiently informed to assess the economic viability of any investment alternatives being considered.

CSNB eventually approved the Morris/Bowman proposal to have the trust funds invested in tax-favored alternatives, and, in early June of 1982, each of the beneficiaries acknowledged receipt of the proposal and executed a written consent to the investment program therein proposed.

In August of 1982, the beneficiaries executed a "Consent and Release" in connection with the trust's purchase of the two limited partnerships that had been proposed by Morris. These documents provided that the beneficiaries understood both the risk associated with the investments and the purpose for which the modification of the trust investment policy was being undertaken, the documents further provided that the beneficiaries waived the applicable law and excused CSNB from any alleged breach of fiduciary duty.

The consent forms read as follows:

I have received information regarding the above investment program and acknowledge the high degree of economic risk associated with these investments and significant compensation to the general partner and others. I further acknowledge that Financial Planning Services, Inc. of which Richard S. Morris is a principal, will receive a commission for the purchase of said programs.

After consideration of the above facts and circumstances, I hereby state as follows:

1) I give my consent and approval for the purchase of the above investments.

2) I relieve The Colorado Springs National Bank from any liability for any loss or losses incurred by the Robert Beyer Trust as a result of such investments.

3) I give this consent and release of my own free will and same shall be binding on behalf of myself, my heirs, successors and assigns.

Consents were also obtained on behalf of the minor beneficiaries. Pursuant to an express trust provision, the parents, Thomas Beyer and Joan Morris, had the authorization to act for their children and to so bind them. That trust provision stated: "the person having the right of custody of a minor beneficiary, may act for such beneficiary for all purposes under the administrative provisions of this Agreement."

In May 1983, nearly a year after the initial investments were made, CSNB notified the beneficiaries it was resigning as trustee and that its resignation was to become effective in July. At about the same time, defendant First National agreed to serve as successor trustee of the trust.

First National's agreement, however, was conditioned upon the beneficiaries' willingness to indemnify First National against any losses incurred by the trust as a result of investments in tax-shelter programs. First National informed the beneficiaries by letter that the investments being contemplated for the trust upon the recommendation of Morris were "not normally considered prudent, fiduciary-quality assets" and "it should always be remembered that, by its very nature, the type of tax sheltered investment contemplated for this trust carries with it a very high risk potential to the principal investment." As to one such investment, the beneficiaries were advised by First National that, "prior to any commitment of funds to an investment of this kind, we will ask each of you, both for yourself and for your descendants, to approve the investment and to indemnify the Bank against any loss to the trust that may result from that investment."

First National later sent forms for the beneficiaries' signatures which read, in pertinent part, as follows:

The undersigned hereby states, verifies and agrees to the following:

1) That (he) (she) approves and agrees that The First National Bank of Colorado Springs, Trustee, shall invest the sum of $350,000 in the ENVIROGAS 1983–1 JOINT VENTURE, and that (he) (she) is fully aware of the speculative nature and risk of such investment; that this approval of said investment is made on behalf of the undersigned and on behalf of any and all issue, heirs and assigns of the undersigned.

2) That (he) (she) hereby indemnifies and agrees to hold harmless the First National Bank of Colorado Springs for any loss to the Robert Beyer Trust or its beneficiaries that may result from its investment in ENVIROGAS 1983–1; and that this indemnification shall be binding on (him) (her) and on (his) (her) issue, heirs and assigns.

Monica Beyer, Joan Morris, and Thomas Beyer signed and returned these forms to First National in August of 1983.

During First National's tenure as trustee, which spanned the period from July 1983 through September of 1985, the trust invested $650,000 in two oil and gas drilling funds, another $22,000 in an equipment leasing program, and the balance of approximately $740,000 in four different real estate limited partnerships. The investments in question were merely extensions of the strategy which CSNB had instituted and reflected Morris and Bowman's control over and initiation of this tax-avoidance-based investment policy.

With respect to each of these investments, "approval, indemnification, and agreement forms" identical in all material respects to the one quoted above were signed by Monica Beyer, Joan Beyer Morris, and Thomas Beyer, individually, and by Thomas Beyer and Joan Morris on behalf of their minor children.

First National served as trustee until September 1985, when it was terminated by the beneficiaries. Thereafter, concerned chiefly that the value of the trust's investments had trended downward, Monica Beyer, in early 1986, hired a consultant to

evaluate the trust. This evaluation advised the beneficiaries that the assets were not liquid, and that they had a questionable and, perhaps only at best, a nominal, value.

No one questioned the propriety of the investment policy until almost two years later, when the beneficiaries filed the complaint in this action. The complaint alleged, among other things, breach of fiduciary duties, negligence, and bad faith on the part of both CSNB and First National. Defendants denied the allegations and asserted by way of affirmative defenses that the claims against them were barred both by the applicable statutes of limitations governing breach of trust claims and by consent.

After some procedural changes, the matter proceeded to trial on the defendants' affirmative defenses. At the conclusion of the trial, judgment was entered in favor of defendants.

In a well-reasoned and thorough opinion, the trial court concluded that all beneficiaries were fully informed about the attendant risks and that each had validly consented to modification of the trust investment practices. The court further concluded that the adult beneficiaries were authorized by the trust agreement to make legally binding consents on behalf of the minor beneficiaries. The trial court rejected defendants' statute of limitations defense.

## I.

Plaintiffs assign as error the trial court's conclusion that the claims against defendants were barred by consent or ratification of the trustee's acts. We perceive no error.

## A.

The Restatement (Second) of Trusts § 2 (1955) defines trust as "A fiduciary relationship with respect to property." If a fiduciary relationship takes the form of a trust, the law's response has been to hold the fiduciary to a strict standard of care and loyalty and generally to prohibit the fiduciary or trustee from making non-traditional investments which put at risk the preservation of the corpus or the amount and regularity of income to be derived. Section 15-1-304, C.R.S. (1987 Repl.Vol. 6B).

■ A trustee is required to exercise care in assessing an investment opportunity with regard to its safety and income potential by evaluating the history of the type of investment to be made and considering the opinions of experts, if necessary. *See Rippey v. Denver United States National Bank*, 273 F.Supp. 718 (D.Colo. 1967). The trustee must also exercise the degree of skill and caution of a reasonably prudent investor. *Heller v. First National Bank*, 657 P.2d 992 (Colo.App.1982). This standard is imposed to assure that, if the trustee has no experience in an investment, performance will be judged in accordance with a rule designed for the protection of the beneficiaries of the trust.

■ The law's posture slackens considerably, however, if a beneficiary consents to a deviation from the traditional standards regarding investment policies. The trust beneficiary cannot hold the trustee liable for breach of trust if the beneficiary has consented to the act or omission by the trustee. Restatement (Second) of Trusts § 216 (1959).

■ If all beneficiaries of a trust are fully informed and all consent to an investment strategy which departs from traditional practices or objectives, no breach of trust has occurred. *Heller v. First National Bank, supra.*

■ This rule is a corollary of the proposition that a trustee has a continuing duty to administer the legal estate according to the interests of the beneficiaries involved. Thus, beneficiaries, acting with knowledge of the facts and of their legal rights, may direct the trustee's performance and, if losses are sustained thereby, they cannot be heard to complain. *See* G. Bogert & G. Bogert, *Law of Trusts & Trustees* § 941 (rev. 2d ed. 1982); 3 A. Scott & W. Fratcher, *Law of Trusts* § 216 (4th ed. 1988).

Accordingly, we find guidance in the principles set out in the Restatement (Sec-

ond) of Trusts § 216 (1959). That section provides:

(1) Except as stated in Subsections (2) and (3), a beneficiary cannot hold the trustee liable for an act or omission of the trustee as a breach of trust if the beneficiary prior to or at the time of the act or omission consented to it.

(2) The consent of the beneficiary does not preclude him from holding the trustee liable for a breach of trust, if

(a) the beneficiary was under an incapacity at the time of such consent or of such act or omission; or

(b) the beneficiary, when he gave his consent, did not know of his rights and of the material facts which the trustee knew or should have known and which the trustee did not reasonably believe that the beneficiary knew; or

(c) the consent of the beneficiary was induced by improper conduct of the trustee.

(3) Where the trustee has an adverse interest in the transaction, the consent of the beneficiary does not preclude him from holding the trustee liable for a breach of trust not only under the circumstances stated in Subsection (2), but also if the transaction to which the beneficiary consented involved a bargain which was not fair and reasonable.

This section provides a useful framework for analyzing the issues surrounding the beneficiaries' consent to the trust investments.

■ In applying these principles to a particular investment, a court should not use the advantage of hindsight. *Heller v. First National Bank, supra.* Rather, it must consider: 1) the beneficiary's education and business experience; 2) the beneficiary's input in negotiating the terms of the allegedly improper investment; 3) the clarity of the consent language; 4) the amount of time the beneficiary had for deliberation before signing the consent; 5) whether the beneficiary read the consent and considered its terms before signing it; 6) whether the beneficiary knew his or her rights under the trust and the relevant facts when the consent was signed; 7) whether the beneficiary was given an opportunity to consult with advisors or an attorney before signing the consent; and 8) whether the beneficiary's consent was induced by improper conduct on the trustee's part. *See* G. Bogert & G. Bogert, *Law of Trusts & Trustees* § 941 & § 943 at 475 through 480 (rev. 2d ed. 1982).

Here, the trial court found it unnecessary to pass on the trustees' obligations with respect to the modification and redirection of the trust investment strategy that would be implied by the standard of prudence pursuant to § 15–1–304, C.R.S. (1987 Repl.Vol. 6B). Instead, the trial court evaluated the modification of the trust's investment objectives and practices as the product of a desire to avoid untoward tax consequences and as evidence of the confidence which the adult beneficiaries had placed in Richard Morris' and William Bowman's stewardship of the family assets. In light of this perspective, the trial court found that the beneficiaries had validly consented to the purchase of the tax shelter investments and that, therefore, their claims were barred.

### B.

■ We analyze first the validity of the consents executed in connection with the investments made by CSNB, predecessor in interest to United Bank.

Objections to these investments were raised on behalf of the minor beneficiaries, Kevin Beyer and Robin Morris. The claims of Monica Beyer, Joan Beyer Morris, and Thomas Beyer were reserved for a second trial.

Plaintiffs, in effect, take the position that CSNB may not rely upon the consents as a defense because the nature of the transactions was such that the beneficiaries had been lulled into a false sense of believing that CSNB had informed itself with respect to the details of the tax shelters. Plaintiffs also argue it was improper for the trial court to have imputed the knowledge of Bowman and Morris to the beneficiaries for the purpose of deciding whether the beneficiaries were alerted to the consequences of signing the consents. They argue further

that CSNB had an affirmative duty to disclose both its unfamiliarity with these types of investments and the divided vote of its investment committee and that its deliberate "decision" not to do so should be considered as a breach of fiduciary duty.

Another factor complained of by the plaintiffs relating to CSNB was the bank's reliance upon Richard Morris to convey information about the investments to the beneficiaries. According to the plaintiffs, inasmuch as Morris had acquired an interest in the purchase of the investments through a commission and fee arrangement with the issuer, he should not have been realistically viewed by CSNB as impartial in providing information about these investments. Therefore, plaintiffs urge that we should reverse the trial court's determinations and find that the consents were based upon insufficient information and that CSNB failed in its duty to furnish adequate and sufficient information. We decline to do so.

Findings of the trial court are accorded great deference and will not be disturbed on review unless manifestly erroneous. *Page v. Clark*, 197 Colo. 306, 592 P.2d 792 (1979).

Here, the evidence indicates that, in May of 1982, a letter was sent to the adult beneficiaries stating that the alternative program of trust investment being proposed on their behalf was presented to CSNB for its review, analysis, and comment. The author of this letter was William Bowman, whom the trial court found to be the agent of the beneficiaries. It was undisputed that the persons who presented the modified investment program to CSNB were Morris and Bowman. The testimony of Monica Beyer and Thomas Beyer indicated further that the beneficiaries were aware of the contacts and significant dealings by Morris and Bowman on their behalf with officers of CSNB. This evidence, in our view, was sufficient to establish the existence of an agency relationship between Bowman and/or Morris and the beneficiaries. It was thus within the trial court's prerogative to so conclude. *See*

*People v. Morrow*, 682 P.2d 1201 (Colo. App.1983).

CSNB's encouragement of Morris and Bowman's inquiry to obtain information about the proposed investments and its reliance upon their knowledge, expertise, and experience to assess the wisdom of the alternate investments did not undermine the terms of the trust. In this regard, the plaintiffs sought at trial to classify CSNB's failure to investigate independently these investments as an attempt to conceal the true extent of CSNB's effort to stay informed with respect to the affairs of the trust. The trial court concluded that the investments had been made with no attempt at concealment.

We see no evidence to support the contention that there was a failure to disclose by CSNB. Though the circumstantial evidence regarding the propriety of making these investments is equivocal, it is sufficient to require us to accept the trial court's well-reasoned and thorough assessment of the credibility of evidence and let stand its finding that there was no attempt at misrepresentation or concealment on CSNB's part. *See Varady v. White*, 42 Colo.App. 389, 595 P.2d 272 (1979).

Furthermore, it was established that both Monica and Thomas Beyer were capable of understanding the risky nature of the proposed investment strategy and that they exercised input in approving its terms. Likewise, they were given sufficient time within which to deliberate the relevant facts existing at the time of the investments and obviously had read the consents and considered them before signing. In light of the factors listed in Restatement (Second) of Trusts § 216 (1959), we agree with the trial court that the consents were legally sufficient and validly obtained. Consequently, the consents as to CSNB should be enforced.

### C.

The beneficiaries assert First National failed to satisfy its burden of proving that they were aware of facts legally sufficient for effective consents to the breach of trust. We disagree.

The finding of valid consent to the purchases made by First National is supported by the evidence. Again we note, as the trial court found, that the adult beneficiaries were presented with clear and understandable consent forms which unambiguously released First National of liability relating to selected investments. First National, from the outset of its appointment as successor trustee, undertook to inform the beneficiaries of risks inherent in tax-sheltered investments and gave the beneficiaries sufficient time within which to take precaution and consult with others before they signed the consents. The beneficiaries read the consents pertaining to First National and understood their terms.

Furthermore, since, through the careful counselling of Morris and Bowman, the beneficiaries were apprised of material facts relating to the investments and were advised of their rights under the trust agreement, there was no disparity or concealment of knowledge. The knowledge that Morris and Bowman obtained during the course of their inquiry, together with their financial and legal expertise as agents, must be imputed to the adult beneficiaries as principals. *See People v. Morrow, supra;* Restatement (Second) of Agency § 9(3) (1958).

In light of the plain language of the consents and the fact that First National correctly informed plaintiffs that the investments being contemplated involved a high degree of risk to the trust corpus, the trial court properly determined that there was no overreaching or other misconduct by First National or that it failed to disclose material information. By fully disclosing the risk, First National was entitled to rely on the beneficiaries' independent judgment and on the information provided by Morris and Bowman relative to the wisdom of the investments.

We agree with the trial court that the requirements set out in Restatement (Second) of Trusts § 216 comment k (1959) were met here. It provides:

> *Beneficiary's ignorance of facts and of his rights.* Since the trustee is in a fiduciary relation to the beneficiary, he should inform the beneficiary of his rights and of the material facts affecting a transaction which is a deviation from the terms of the trust, insofar as the trustee knows or should know these facts. The consent of the beneficiary does not preclude him from holding the trustee liable for a deviation from the terms of the trust, unless the beneficiary understands that the transaction is a deviation from the terms of the trust and that he is entitled to require the trustee to administer the trust according to its terms. It is not necessary that the trustee should inform the beneficiary of all the details of which the trustee knows, but he should see that the beneficiary is sufficiently informed so that he understands the character of the transaction and is in a position to form an opinion as to its advisability. Thus, if the trustee proposes to invest in speculative securities in which he is not permitted to invest by the terms of the trust, the trustee should inform the beneficiary not only that the securities are not a proper trust investment but should tell him of the nature of the risk involved. If, however, the trustee is led by the beneficiary to believe that the beneficiary is fully informed, the trustee cannot be held liable even though the beneficiary did not in fact have full information.

Accordingly, the trial court correctly concluded that the beneficiaries' consents effectively extinguished the claims asserted against First National in this suit.

## II.

Plaintiffs contend that the consents were ineffective as to the minor beneficiaries because these children were too young to understand the nature of the investments made on their behalf and that, consequently, the actions of the adult beneficiaries do not work an estoppel of their claims. Defendants assert that this issue was not argued sufficiently in the trial court so as to preserve it for review. We elect to decide the issue on its merits, and we reject plaintiffs' contentions.

Trust law endorses a number of methods by which investment objectives can be pursued; one of these allows the settlor to impose on the trust any investment policy he or she chooses. *See* § 15–1–305, C.R.S. (1987 Repl.Vol. 6B). The rationale underlying this doctrine rests upon the law's respect for the settlor's pre-implementation property rights.

Here, the trust agreement expressly permitted the parents of the minor beneficiaries to act on their behalf "for all purposes under the administrative provisions of [the trust]." In the formulation of the trust agreement, two standard classifications of provisions were established: those controlling the distribution of trust income and principal, termed dispositive provisions; and all others, termed administrative provisions. G. Bogert & G. Bogert, *Law of Trusts & Trustees* § 561 (rev. 2d ed. 1980). The language authorizing actions on behalf of minor beneficiaries focuses on the administrative provisions of the trust and reference therein is to all such provisions—an expression consistent with approval and ratification of investment practices that would otherwise be in violation of the trust document or of the common law.

The trust authorized the trustee to invest assets in accordance with a broad grant of power. Consequently, consents to modification of investment policies, whether executed on behalf of adult beneficiaries or minor beneficiaries, were acts consistent with the trustee's powers pursuant to the administrative provisions of the trust. The settlor clearly contemplated and allowed for the possibility that all beneficiaries could authorize an investment policy which followed nonconventional avenues, but nevertheless was consistent with administration of the trust solely in their interest.

We believe this interpretation to be consistent with the analysis applied under the doctrine of virtual representation with respect to class gifts authorizing certain beneficiaries to bind others when the interests of the two are compatible. *See In re Estate of Lange*, 75 N.J. 464, 383 A.2d 1130 (1978) (adult remaindermen's validation of *ultra vires* act of fiduciary held as binding on their minor children because there was no hostility perceived between the interest of the presumptive takers, the adults, and the interest of the other members of the respective classes so as to render virtual representation inequitable).

In the present case, there is no suggestion of a conflict of interest between the adult beneficiaries and the minor beneficiaries concerning the alteration of the investment policy. Accordingly, and in recognition of the settlor's dependence on, and specific authorization to, the adult beneficiaries to act in their children's interests, we believe the trustees should be independently exonerated with respect to the claims of the minor beneficiaries.

The determination of the trial court as to the validity of the minors' consents must therefore be upheld.

### III.

Because we affirm the trial court's judgment on the basis of its findings pertaining to the issue of consent, we need not address the contentions of defendants raised on cross-appeal relating to the effect of the statutes of limitation.

The judgment is affirmed.

HUME and ROTHENBERG, JJ., concur.